Colby v. SSA                    CV-96-238-M   05/09/97

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Eleanor Colby,
     Plaintiff

     v.                                    Civil No. 96-238-M

Shirley Chater, Commissioner,
Social Security Administration,
     Defendant


## O R D E R


Pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), Eleanor Colby seeks review of a final decision by the Commissioner of the Social Security Administration denying her claim for benefits.  Before the court is plaintiff's motion to reverse the decision of the Commissioner.  The Commissioner objects, and moves to affirm that order.  For the reasons set forth below, plaintiff's motion is denied.


## Administrative Proceedings

Plaintiff filed an application for disability insurance benefits on April 28, 1993, alleging an inability to maintain gainful employment since May 10, 1988, due to fibrocytis fibromyalgia, which causes chronic muscle pain and spasms.  Her claim was denied initially and again on reconsideration.  Subsequently, she requested a hearing, which was held on February

27, 1995, before Administrative Law Judge Frederick Harap. Plaintiff appeared in person and testified. She was represented by Arthur Kaufman, a lay representative who is also a vocational expert.

In a decision issued on March 31, 1995, the ALJ denied plaintiff's claim at step four of the relevant sequential evaluation process. See 20 C.F.R. § 404.1520(e). The ALJ concluded that plaintiff had "sufficient residual functional capacity for a substantially full range of light work" (T.21), and, therefore, was able to perform her past relevant work as an electronic skills instructor. Moreover, he concluded that even if plaintiff were unable to perform the tasks associated with that occupation, she retained, at a minimum, the residual functional capacity to perform sedentary work. Accordingly, the ALJ held that plaintiff was not disabled within the meaning of the Act.

**Facts**

I. <u>Medical Evidence</u>.

Eleanor Colby, is a 47 year-old resident of Danbury, New Hampshire. While employed as an electronics assembler/computer skills instructor in October of 1987, she began to develop back

and neck pain (T.100). She was treated initially by Dr. Carey Rodd in Salisbury, New Hampshire, from December 1987 through October 1992 (T.82). He prescribed physical therapy and medication, and diagnosed her condition as myofascial pain syndrome (T.82, 219-224).

For two weeks in late April of 1988, plaintiff attempted to work on a part-time basis (T.81). Her efforts were unsuccessful and she has not been employed since May 10, 1988. From July of 1988 through August of 1990, she was treated by Dr. Seddon Savage, a pain specialist at Dartmouth Hitchcock Hospital (T.158-67). In her initial evaluation of plaintiff, dated July 27, 1988, Dr. Savage noted that plaintiff had a full range of motion in her lumbar spine and neck, but experienced discomfort in her back muscles when pulling (T.159). Muscle tenderness was noted in her shoulder with a large trigger point noted in her upper back (Id.). Other tests were within normal ranges, including reflexes, straight leg raising, and motor strength.

Dr. Savage opined that plaintiff demonstrated a "secondary myofascial pain syndrome due to overuse associated with her assembly work" (Id.). She felt plaintiff would be unlikely to return to her past work in the near future. Although Dr. Savage

3

believed plaintiff could return to a managerial position with no assembly work, she noted that plaintiff's long drive to work might make a successful return difficult (Id.). She recommended injections of pain medications at the trigger points[1] in plaintiff's left shoulder (T.161). In a June 5, 1989 note, Dr. Savage observed that plaintiff was released for work with restrictions in January 1989 and had sought appropriate work, but was unsuccessful (T.162). Plaintiff's fibromyalgia had been asymptomatic for almost two months, but she experienced a flare up after sitting in the cold at her daughter's track meet (Id.). In a letter to plaintiff's compensation attorney, Dr. Savage noted that she had been treating plaintiff for persistent work-related shoulder and left arm pain, which she diagnosed as overuse fibromyocytis due to repetitive muscular contraction (T.163). Muscle relaxants such as flexeril were needed for pain flare-ups, but were not necessary if plaintiff paced her activities and did not overuse the affected muscles (Id.). Dr. Savage noted that plaintiff had been ready to return to work for several months, but had experienced difficulty in finding appropriate employment (T.163-64). Dr. Savage also noted that "the only limitations which have been imposed on her are that her

---

[1] Trigger point - A specific point on the body at which touch or pressure will give rise to pain. P. 806, Stedman's Concise Medical Dictionary (2d Ed. (Williams & Wilkins, 1995).

4

work not involve repetitive or heavy use of her arms, particularly the left arm, and that her work be done within thirty-five miles of home" (Id.). Dr. Savage cautioned, however, that she could not predict if plaintiff's condition would be permanent or if it would gradually resolve in a few years. She felt it more likely that Ms. Colby would have a "persistent tendency" for further muscle spasms and pain (T.164).

In a disability report prepared for plaintiff's insurance carrier, Dr. Savage diagnosed plaintiff's condition as "overuse fibrocytis/ myofascial dysfunction." (T.165). Her treatment for this ongoing problem included medication, supervised physical therapy, and trigger point injections (Id.). Dr. Savage felt plaintiff could not return to her past job because the commute to work was too great. However, Dr. Savage stated that other lighter, more suitable work with less driving may be appropriate (T.166).

On December 12, 1989, Susan A. Emerson, an occupational therapist, performed an upper extremity work capacity evaluation on plaintiff. This evaluation revealed no atrophy, edema, or deformities. Ms. Emerson reported that plaintiff had a full active range of motion in her shoulder, elbow, forearm, wrist and

5

fingers (T.226). Trigger points for pain were noted in the paracervical muscles, scapula, and trapezium (T.227). Plaintiff's ability to reach was normal (T.228), but her ability to lift was limited to 10 pounds repetitively with a maximum lifting/carrying capacity of 15 pounds (Id.). While her range of motion was normal, her grip strength in both hands was below normal (T.229). Ms. Emerson noted, however, that plaintiff's performance on other strength tests suggested that she "may not have exerted maximal effort during grip testing" (Id.). Ms. Emerson concluded that plaintiff had a light to moderate work capacity, but with limitations on constant forward head movement. Additionally, it was recommended that she be provided with work which permitted some variety in head posturing and did not require repetitive reaching at or above shoulder height (Id.). Extensive driving was limited and she was told to do no lifting more than 20 pounds using both hands or 10 pounds with either hand (T.229-30).

Subsequently, a permanent impairment evaluation was done on June 27, 1990 (T.231) by plaintiff's workers' compensation carrier. Its doctor, Kenneth O'Neil, M.D., felt that plaintiff had reached a medical endpoint and noted that she had ongoing

6

problems with tenosynovitis[2] and myofascial[3] pain.  He concluded

that she had minor residual permanent impairment of 3% in her

dominant right upper extremities and 2% in her non-dominant left

upper extremities, based on continued intermittent trigger points

(T.236).  Ultimately, however, he concluded that she did not have

"any significant permanent impairment" (T.234).


On January 29, 1993, the plaintiff was examined by a

consultative neurologist, Dr. Lawrence Jenkyn, at the request of

the Disability Determination Services ("DDS")(T.250-51).

Dr. Jenkyn found that plaintiff had point tenderness over both

trapezium muscle groups, however the rest of her neurological

exam was normal (T.251).  Dr. Jenkyn also noted that there was no

way to document the nature of plaintiff's pain other than by

historical reports.  Further, he observed that plaintiff had not

undergone CT, MRI, NCS (nerve conduction study), or EMG

(electromyography) testing.  Dr. Jenkyn speculated that such

tests were not performed because plaintiff's doctors had

---

[2]  Tenosynovitis - The inflammation of a tendon and its
enveloping sheath.  Stedman's Concise Medical Dictionary (2d Ed.
(Williams & Wilkins, 1995).

[3]  Myofascial - Relating to the fascia (a sheet of fibrous
tissue that envelopes the body beneath the skin and encloses
muscles and muscle group.  P. 370, Stedman), surrounding and
separating the muscle tissue.  Id. at 664.

7

predicted that the results of those tests would be normal (T.251).

Plaintiff was also seen and treated by Dr. Hoke Shirley, a rheumatologist in Concord, New Hampshire, from October 27, 1993, through her date last insured. In his initial evaluation, Dr. Shirley noted that despite a full range of motion in all joints of the upper and lower extremities, plaintiff had multiple tender points in the head, neck, and back muscles. He also noted plaintiff's pain in the bicep region, shoulder blade area, buttocks, and trochanter[4] region (T.266). Plaintiff also reported some bilateral tenderness in her calves. However, other diagnostic orthopedic tests, such as Flip and straight leg raising (SLR), were negative (Id.). Additionally, plaintiff's neurologic exam was non-focal (T.266).

Applying the American College of Rheumatology criteria and based on his examination and plaintiff's subjective complaints of pain and fatigue, Dr. Shirley diagnosed plaintiff as suffering

---

[4] Trochanter - A bony prominence developed from independent osseous centers near the upper extremity of the femur. Stedman's Concise Medical Dictionary p. 1054 (2d Ed. (Williams & Wilkins, 1995).

8

from a fibromyalgia[5] (T.266).  He also noted that "severe bouts of muscle spasm and pain" accompanied certain physical activities, which prevented plaintiff from utilizing certain home physical therapy treatment.  Increased dosages of amitriptyline[6] had provided some temporary pain-free sleep and fewer spasms, but did not resolve her pain problems (T.265).

Dr. Shirley's follow-up treatment notes on December 8, 1993, reference persistent tender points.  However, Dr. Shirley observed that plaintiff had essentially a full range of motion and a non-focal neurological exam (T.267) and noted that "[o]verall, [she is] doing fairly well with several exacerbations" (T.268).  With regard to plaintiff's medications and therapy, Dr. Shirley noted that "she just needs to continue the present medication dosages including 50 mg. of Amitriptyline at bedtime, 10 mg. of Flexeril [a muscle relaxant], stress reduction techniques, coping mechanisms, lumbar and cervical dysfunction exercises, and aerobic activity" (Id.).

_____

[5]  Fibromyalgia - A condition where widespread pain, decreased pain threshold to palpation, and other characteristic symptoms are present with multiple trigger points.  The syndrome has been characterized as a disorder of pain modulation. (See T.288, 294).

[6]  Amitriptyline - An anti-depressant medication frequently used by physicians to treat fibromyalgia and sleep disturbance.

9

In assessing plaintiff's physical limitations, Dr. Shirley noted that her back problem continued to persist for over 3 months despite prescribed therapy and that her pain was caused by trigger points which restricted her to lifting 10 pounds frequently and 20 pounds occasionally (T.271). Additionally, he found that plaintiff could stand and walk for one hour at a time, and up to a total of two hours during a working day. He also opined that plaintiff could sit for two hours at a time, and up to six hours during a work day. He concluded that plaintiff could alternate between sitting and standing for a total of eight hours during the day. Dr. Shirley opined that plaintiff was restricted from pushing and pulling arm controls as well squatting, crawling, or climbing (T.272). Although plaintiff was able to reach and bend, she had severe restrictions with regard to working at heights and around moving machinery, as well as being exposed to marked humidity, temperature changes, dust or fumes. Dr. Shirley believed plaintiff's complaints of fatigue and pain were credible and attributed them to fibromyalgia.

II.  Hearing Testimony.

Plaintiff testified that she had almost 8 years experience as an assembler and more recently as an instructor in cable assembly work for Computer Vision. Because of constant

10

repetitive reaching and fabricating, she gradually developed pain in her shoulders which caused tingling in her shoulders and ultimately lead to spasms, which progressed to daily events (T.46). To properly relieve this daily pain while she worked, she required pain medication and rest (T.47). The tingling pain, if not treated, progressed to a hardness in her shoulder that lead to muscle spasms. She said that the only way to reduce the pain and the spasms was for her to ice them or lay in a hot tub (Id.). Plaintiff testified that if a tingling sensation was left untreated, it would sometimes become a burning sensation like being stabbed with a knife (T.48). The level of her discomfort depended upon the nature of her activity and the frequency at which she could rest her arms and shoulders. She estimated that she had yearly flare-ups of her worst symptoms which would then last from one to three months (T.49). During those periods, she said that she could do very little activity and almost any exertion could cause instantaneous pain (Id.). She described disturbed sleep patterns, flu-like symptoms, and muscle aches that would persist for days despite her daily use of sleep medications and muscle relaxants (T.269). She testified that since the onset of her fibromyalgia, she drives very little. She did, however, concede that she is able to drive to the store and

11

the post office on a daily basis and go grocery shopping once a week (T.51).

She recounted for the ALJ the various treatment regimens she has undergone since 1987, including her trigger point injections of lidocaine and physical therapy from December 1987 through June 21, 1989 (T.109-157). Finally, she noted that her daily activities are now restricted and she is unable to shovel snow, do yard work or gardening, or take out the rubbish (T.54). She reported that any prolonged sitting or use of her arms triggers spasms that force her to lie down and ice the affected areas. Due to the unpredictable nature and intensity of her symptoms, she said that she is afraid to go far from her home (T.55).

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." Factual findings of the Secretary are conclusive if supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Irlanda

<u>Ortiz v. Secretary of Health and Human Services</u>, 955 F.2d 765,

769 (1st Cir. 1991).[7]


In making those factual findings, the Commissioner

(formerly, the "Secretary") must weigh and resolve conflicts in

the evidence. <u>Burgos Lopez v. Secretary of Health and Human</u>

<u>Services</u>, 747 F.2d 37, 40 (1st Cir. 1984) (citing <u>Sitar v.</u>

<u>Schweiker</u>, 671 F.2d 19, 22 (1st Cir. 1982)). It is "the

responsibility of the Secretary to determine issues of

credibility and to draw inferences from the record evidence.

Indeed, the resolution of conflicts in the evidence is for the

Secretary, not the courts." <u>Ortiz</u>, 955 F.2d at 769. And, the

court will give deference to the ALJ's credibility

determinations, particularly where those determinations are

supported by specific findings. <u>Frustaglia v. Secretary of</u>

<u>Health and Human Services</u>, 829 F.2d 192, 195 (1st Cir. 1987)

(citing <u>Da Rosa v. Secretary of Health and Human Services</u>, 803

F.2d 24, 26 (1st Cir. 1986)).

─────────────────────

[7] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938). It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. <u>Consolo v. Federal Maritime Comm'n.</u>, 383 U.S. 607, 620 (1966).

A person seeking Social Security disability benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  The Act places a heavy initial burden on the plaintiff to establish the existence of a disabling impairment. Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health and Human Services, 944 F.2d 1, 5 (1st Cir. 1991).  To satisfy that burden, the plaintiff must prove that her impairment prevents her from performing her former type of work. Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985) (citing Goodermote v. Secretary of Health and Human Services, 690 F.2d 5, 7 (1st Cir. 1982)).  Nevertheless, the plaintiff is not required to establish a doubt-free claim; the initial burden is satisfied by the usual civil standard -- a "preponderance of the evidence." See Paone v. Schweiker, 530 F. Supp. 808, 810-11 (S.D. Miss. 1982).  In assessing a disability claim, the Secretary considers objective and subjective factors, including: (1) objective medical facts; (2) the plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witnesses; and (3) the plaintiff's educational background,

14

age, and work experience. See, e.g., Avery v. Secretary of Health and Human Services, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote, 690 F.2d at 6.

Once the plaintiff has shown an inability to perform her previous work, the burden shifts to the Secretary to show that there are other jobs in the national economy that she can perform. Vazquez v. Secretary of Health and Human Services, 683 F.2d 1, 2 (1st Cir. 1982). If the Secretary shows the existence of other jobs which the plaintiff can perform, then the overall burden remains with the plaintiff. Hernandez v. Weinberger, 493 F.2d 1120, 1123 (1st Cir. 1974); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

When determining whether a plaintiff is disabled, the ALJ is required to make the following five inquiries:

(1)  whether the claimant is engaged in substantial gainful activity;
(2)  whether the claimant has a severe impairment;
(3)  whether the impairment meets or equals a listed impairment;
(4)  whether the impairment prevents the claimant from performing past relevant work; and, if so,
(5)  whether the impairment prevents the claimant from doing any other work.

20 C.F.R. § 404.1520.  The mere existence of a medical impairment is, however, insufficient to entitle a plaintiff to benefits. Ultimately, a plaintiff is disabled under the Act only if her:

> physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).


## Discussion

No one appears to doubt that plaintiff is impaired and suffers pain.  The relevant inquiry is, however, whether she is disabled within the meaning of the Act.  And, on that point, the medical evidence supportive of plaintiff's position is, at best, minimal.  Importantly, none of her treating or examining physicians opined that she is permanently disabled.  In fact, one of her examining physicians said that he did not believe that plaintiff had "any significant impairment" (T.234) and estimated that her extremity impairment was only "3% for her dominant right upper extremity and 2% impairment for her non-dominant left upper extremity" (T.236).  Of the remaining physicians who treated or examined plaintiff, those who expressed an opinion (with the exception of Dr. Shirley) stated that: (1) she was only

16

restricted from heavy use of her arms, including lifting more than 20 pounds with both arms and more than 10 pounds with one arm; (2) she should avoid repetitive reaching at or above shoulder level; (3) she should not engage in any crawling, squatting, or climbing; and (4) she should limit the distances which she travels in her car.

In addition to the physicians and occupational therapists who treated and/or examined plaintiff, two non-examining, Disability Determination Services physicians reviewed plaintiff's entire medical record. Each concluded that she was not totally disabled (T.62-69). On July 12, 1993, Dr. Homer Lawrence concluded that plaintiff's condition caused her to suffer from no exertional limitations. He also concluded that, other than plaintiff's subjective complaints of pain, there was no medical evidence which would support the conclusion that she is disabled (T. 69). In September of 1993, Dr. Craig Campbell reviewed plaintiff's medical records and affirmed Dr. Lawrence's conclusions.

Nevertheless, plaintiff disputes the ALJ's conclusion that she is not disabled and claims that the ALJ erred when he failed to give controlling weight to the medical opinion of Dr. Shirley,

17

who reported that plaintiff had some exertional limitations (T.272) and experienced pain that was "frequently debilitating" (T.273). As plaintiff correctly notes, generally, the ALJ must afford more weight to the medical opinions of a claimant's treating physicians because those sources are:

> likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). Of course, the ALJ may decide not to give controlling weight to the opinions of a plaintiff's treating physicians. However, if the ALJ does not give those opinions controlling weight, he or she must "always give good reasons in [the] notice of determination or decision for the weight [the ALJ gave] to [the claimant's] treating source's opinion." Id.

Even assuming that Dr. Shirley may properly be viewed as plaintiff's treating physician (a point which the Commissioner disputes, citing 20 C.F.R. § 404.1527(d)(2)(i) and alleging that his treatment of plaintiff lacked the requisite "longitudinal relationship"), Dr. Shirley's opinions fail to support plaintiff's claim that she is disabled within the meaning of the

18

Act.  First, Dr. Shirley never opined that plaintiff was totally disabled.  Instead, he noted that plaintiff had some functional limitations which might restrict the nature of work which she might successfully perform (T.271-73).  Second, Dr. Shirley concluded that plaintiff could, among other things: (1) lift 20 pounds at one time; (2) lift 10 pounds frequently; (3) remain on her feet for at least an hour at a time and for a total of 2 hours during a work day; (4) remain seated for at least an hour at a time and for a total of 6 hours during a work day; (5) alternate between sitting and standing for 8 hours a day without the need to lie down; (6) drive with mild limitations regarding distances traveled and duration in the car; (7) use her hands for simple grasping and fine manipulation; and (8) push and pull leg and foot controls.

Even if the ALJ had accepted all of Dr. Shirley's opinions (which he plainly was not required to do), it is unclear whether he would have changed his ultimate conclusion that plaintiff is not disabled within the meaning of the Act; the environmental and exertional limitations which Dr. Shirley suggested should be imposed upon plaintiff are not inconsistent with a conclusion that she is capable of performing light or, at a minimum, sedentary work.  Nor are the exertional limitations suggested by

Dr. Shirley inconsistent with the ALJ's conclusion that plaintiff was capable of performing her prior job as a skills instructor.[8]

Nevertheless, to the extent the ALJ actually discounted some of Dr. Shirley's opinions, he properly articulated his basis for doing so and adequately supported his conclusion that plaintiff is capable of performing a substantially full range of light work with limitations on repetitive overhead reaching (T.17). In reaching that determination, the ALJ specifically noted:

> [T]he undersigned is mindful of the report by Dr. Shirley, who indicates that the claimant is restricted to two hours of standing and walking, and additional postural and environmental restrictions. Under the regulations at 20 C.F.R. 404.1527, a treating source's opinion regarding the disability will be given controlling weight if that opinion is supported by objective medical findings and is not inconsistent with

---

[8] Plaintiff claims that her job classification, as defined in the Dictionary of Occupational Titles ("DOT"), is "Instructor, Vocational Training," DOT classification number 097.221-010. However, nothing contained in the DOT description of that position or in the related description contained in the Guide for Occupational Exploration ("GOE"), suggests that plaintiff's exertional limitations preclude her from returning to that occupation. The GOE provides that a vocational training instructor typically engages in frequent reaching, handling, and fingering. However, Dr. Shirley opined that plaintiff was, among other things, able to use her hands for simple grasping and fine manipulation. Although Dr. O'Neil recommended that plaintiff "avoid repetitive reaching to and above shoulder height" (T.229), nothing in the DOT or GOE suggests that a vocational training instructor typically engages in such activity nor is there any evidence in the record which indicates that plaintiff's former job actually required repetitive overhead reaching.

20

> the other evidence of record. In the present case,
> however, Dr. Shirley's determination is based solely on
> clinical evaluation and the claimant's history of
> subjective complaints. As such, the undersigned finds
> Dr. Shirley's conclusion somewhat speculative in
> nature, and therefore less persuasive (T.17).

Accordingly, the court concludes that the ALJ adequately explained his decision to afford Dr. Shirley's opinions the weight which he gave them. See 20 C.F.R. § 404.1527(d)(2) (the ALJ must "give good reasons in [the] notice of determination or decision for the weight [he gave] to [the claimant's] treating source's opinions."); Arroyo v. Secretary of Health and Human Services, 932 F.2d 82, 89 (1st Cir. 1991) (the ALJ is "not required to accept the conclusion of plaintiff's treating physicians on the ultimate issue of disability.").

Ultimately, the only substantive issue presented with regard to Dr. Shirley's medical opinions is whether the ALJ was required to find that plaintiff was disabled based upon Dr. Shirley's statement that plaintiff's pain was "frequently debilitating." For the reasons set forth above, the court rules that the ALJ was not required to do so and properly articulated his reasons for discounting, to some degree, Dr. Shirley's opinion. Whether the court would have ruled differently if presented with this evidence de novo, is not relevant. The court's inquiry is

limited to, among other things, a determination of whether there is substantial evidence in the record to support the ALJ's conclusion that plaintiff was not disabled within the meaning of the Act. Here, the record plainly contains such substantial evidence.

The court also concludes that the ALJ adequately considered plaintiff's subjective complaints of pain and properly explained his reasons for finding that they were not entirely credible. When a claimant complains that pain or other subjective symptoms are a significant factor limiting his or her ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must consider additional evidence, such as the claimant's prior work record; daily activities; location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, received for relief of pain or other symptoms; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); <u>Avery v. Secretary of Health and Human Services</u>, 797 F.2d 19, 23 (1st Cir.

1986).  The ALJ need not, however, take a plaintiff's subjective complaints at face value.  See Bianchi v. Secretary of Health and Human Services, 764 F.2d 44, 45 (1st Cir. 1985).

Here, the ALJ noted that, among other things, plaintiff is able to perform household chores, including dusting, washing dishes and laundry, vacuuming, cooking, and shopping.  He also observed that plaintiff was able to serve as the treasurer of the local planning board.  Additionally, the ALJ considered plaintiff's use of Amitriptyline and Flexeril on an "as needed" basis, her positive response to various treatment regimens, and her ability to frequently predict and avoid flare-ups in her condition simply by controlling her home environment and modifying her activities.  Plaintiff's ability to perform those (and other) daily and weekly activities, along with her ability to manage her pain, support the ALJ's conclusion that plaintiff "is an individual who is quite able to meet both routine obligations and engage in additional activities of interest despite alleged symptoms of pain and loss of concentration" (T.19).  In short, the court finds substantial evidence in the record to support the ALJ's conclusion that the "lack of an organic basis for the claimant's pain, coupled with the claimant's base line functioning supplemented by only limited

23

medical assistance suggest the presence of a less than debilitating condition" (T.18).

## Conclusion

For the foregoing reasons, the court finds substantial evidence in the record to support the ALJ's conclusion that plaintiff is not disabled within the meaning of the Act. The court also concludes that, notwithstanding plaintiff's arguments to the contrary, the ALJ did not improperly classify plaintiff's past relevant work. Accordingly, the decision of the ALJ is affirmed. Plaintiff's motion for an order reversing the decision of the Commissioner (document no. 4) is denied. Defendant's motion for an order affirming the decision of the Commissioner (document no. 7) is granted.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 9, 1997

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.